IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

STEPHANIE M. REED,                    )
                                      )
              Plaintiff,              )
                                      )
       v.                             ) Civ. No. 09-824-SLR
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security,      )
                                      )
              Defendant.              )

Michael J. Goodrick, Esquire of Wilmington, Delaware. Counsel for Plaintiff. Of
Counsel: David F. Chermol, Esquire of Chermol & Fishman, LLC.

Charles M. Oberly, III, Esquire, United States Attorney, and Patricia A. Stewart, Esquire,
Special Assistant United States Attorney, District of Delaware. Counsel for Defendant.
Of Counsel: Eric P. Kressman, Esquire, Regional Chief Counsel, and Edward C.
Tompsett, Esquire, Assistant Regional Counsel, of the Office of the General Counsel,
Philadelphia, Pennsylvania.

**MEMORANDUM OPINION**

Dated: September 15, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Stephanie M. Reed ("plaintiff") appeals from a decision of Michael J. Astrue, the Commissioner of Social Security (the "Commissioner" or "defendant"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Currently before the court are the parties' cross motions for summary judgment (D.I. 12, 33) and defendant's motion for leave to file a sur-reply in response to plaintiff's reply brief (D.I. 36). The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[1]

## II. BACKGROUND

### A. Procedural History

On January 20, 2005, plaintiff filed an application for DIB alleging disability due to reflex sympathetic dystrophy ("RSD") beginning on September 20, 2001, later amending her disability onset date to August 20, 2004.[2] (D.I. 9 at 165-69) Plaintiff's application was denied initially and on reconsideration. (*Id.* at 147-61) A hearing was held on September 11, 2007 before an administrative law judge ("ALJ"). (*Id.* at 66) On

---

[1] Under § 405(g),

[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g).

[2] Plaintiff filed a prior DIB application, which was denied by an administrative law judge ("ALJ") on August 20, 2004. (D.I. 9 at ) Plaintiff's appeal of the ALJ's decision on her prior DIB application was denied by this court on March 9, 2006. (*Id.* at)

April 7, 2008, the ALJ issued an unfavorable decision finding plaintiff not disabled and

denying plaintiff's claim for DIB. (Id. at 40-57) The Appeals Council granted plaintiff's

request for review of the ALJ's decision, vacating the hearing decision and remanding

the case to the ALJ. (Id. at 36-38) The ALJ held a remand hearing on November 5,

2008 and issued a decision on June 18, 2009, finding that plaintiff suffered from

multiple severe impairments, including RSD, scoliosis, and obesity. (Id. at 15, 74)

However, the ALJ concluded that plaintiff could perform simple unskilled sedentary

work, allowing for two hours of standing or walking in an eight hour period, lifting ten

pounds occasionally and less than ten pounds frequently, and occasionally climbing a

ramp or stairs, balancing, crawling, kneeling, crouching and stooping, because work

existed in significant numbers for an individual with these, and other, functional

limitations. (Id. at 22) More specifically, the ALJ made the following findings:

> 1. The claimant last met the insured status requirements of the Social
> Security Act on March 31, 2005.
>
> 2. The claimant did not engage in substantial gainful activity during the
> period from her amended alleged onset date of August 21, 2004 through
> her date last insured of March 31, 2005 (20 C.F.R. § 404.1571 et seq.).
>
> 3. Through the date last insured, the claimant had the following severe
> impairments: reflex sympathetic dystrophy, scoliosis, and obesity (20
> C.F.R. § 404.1520(c)).
>
> 4. Through the date last insured, the claimant did not have an impairment
> or combination of impairments that met or medically equaled one of the
> listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1 (20 C.F.R. §§
> 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the undersigned finds
> that, through the date last insured, the claimant had the residual functional
> capacity to perform simple unskilled sedentary work as defined in 20
> C.F.R. 404.1567(a) except that she could lift 10 pounds occasionally, less
> than 10 pounds frequently, stand or walk for 2 hours in an 8 hour day, sit

2

for 6 hours in an 8 hour day and occasionally climbing a ramp or stairs, balancing, crawling, kneeling, crouching and stooping but never climbing a ladder, rope or scaffold, with frequent pushing or pulling in the upper extremities, handling, and reaching overhead with the bilateral upper extremities, frequent feeling with the left upper extremity and occasional feeling with the right upper extremity, and avoiding concentrated exposure to hazards, temperature extremes, dust, odors, gases, humidity and wetness.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 401.1565).

7. The claimant was born on December 14, 1970 and was 34 years old, which is defined as a younger individual age 18-44, on the date last insured (20 C.F.R. § 404.1563).

8. The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant number in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569 and 404.1569a).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from August 21, 2004, the amended alleged onset date, through March 31, 2005, the date last insured (20 C.F.R. § 404.1520(g)).[3]

(*Id.* at 14-32) In summary, the ALJ concluded that, through the date last insured,

plaintiff was capable of making a successful adjustment to other work that existed in

significant numbers in the national economy. (*Id.* at 32) The ALJ summarized the

---

[3]The ALJ's rationale, which was interspersed throughout the findings, is omitted from this recitation.

findings of plaintiff's treating and examining physicians and upheld as fair and rational the Disability Determination Service ("DDS") medical consultants' determination that plaintiff was not disabled based on the information contained in the record. (*Id.* at 21) Plaintiff appealed the ALJ's decision on remand to the Appeals Council, which declined to review the decision, making it a final decision reviewable by this court. (*Id.* at 5) Plaintiff filed the present action on November 3, 2009. (D.I. 1 at 1)

## B. Documentary Evidence

Plaintiff claimed disability starting in August 2004 due to complications from an injury to her right arm in 1996 and a re-injury of the arm in 2001. (D.I. 9 at 361, 367) On October 26, 2001, a bone scan of plaintiff's elbows and arms revealed no abnormalities in flow or uptake in the bone. (*Id.* at 251) Plaintiff underwent an MRI of her right elbow on November 18, 2001, which revealed a small elbow joint effusion but no osseous abnormalities and no soft tissue abnormalities except for mild focal edema or inflammatory reaction in the posterior elbow. (*Id.* at 252-53) An EMG performed on December 4, 2001 was within normal limits. (*Id.* at 250)

Plaintiff began treating with orthopedic specialist Randeep Kahlon, M.D. on January 7, 2002 for her right elbow pain. (*Id.* at 343) Dr. Kahlon observed that plaintiff exhibited a passive right elbow range of motion from 10 degrees to 45 degrees and an active range of motion from 20 degrees to 125 degrees, and her grip strength on the right measured 8 pounds compared to 50 to 60 pounds on the left. (*Id.*) Dr. Kahlon treated plaintiff with nerve blocks and recommended a chronic pain evaluation. (*Id.*) Plaintiff reported that the nerve blocks did not reduce her pain, and treatment with a

4

TENS unit likewise did not help. (*Id.* at 342-43)

On February 25, 2002, plaintiff was examined by Dr. John Parkerson for her worker's compensation claim. (*Id.* at 255, 273-77) Dr. Parkerson observed that plaintiff exhibited exquisite tenderness to palpation in her right upper extremity, which was swollen and cool. (*Id.* at 275-77) Because plaintiff's bone scan, electrodiagnostic studies and MRI did not show objective findings consistent with a bone or soft tissue injury that would cause her condition, Dr. Parkerson diagnosed plaintiff with complex regional pain syndrome. (*Id.* at 277) Dr. Parkerson suggested an aggressive course of occupational therapy for desensitization and range of motion, and opined that plaintiff had not yet reached maximum medical improvement. (*Id.*) On May 29, 2002, Dr. Parkerson evaluated plaintiff's EMG and subjective complaints, concluding that plaintiff did not demonstrate a clinical picture consistent with RSD, but seemed to have a symptom magnification disorder. (*Id.* at 272)

Plaintiff treated with neurologist Steven Grossinger from April 24, 2002 to March 30, 2005. (*Id.* at 414-17) Plaintiff complained of numbness and reduced sensation in her hand and forearm with paresthesias at the shoulder and throughout the arm. (*Id.* at 414) Plaintiff's right arm was often cold with swelling and purple discoloration, and her right palm was mottled. (*Id.*) Noting that an EMG performed on April 24, 2002 was within normal limits, Dr. Grossinger concluded that plaintiff's clinical presentation signaled RSD. (*Id.* at 416-17) A follow-up exam with Dr. Grossinger on May 22, 2002 revealed hypersensitivity at plaintiff's right arm, and the color and temperature of plaintiff's right arm again differed from the left, consistent with autonomic dysfunction.

5

(*Id.* at 439) Plaintiff exhibited reduced strength at the right hand, elbow and shoulder. (*Id.*) At an August 15, 2002 follow-up examination, Dr. Grossinger noted that plaintiff complained of cognitive difficulty, losing track of activities and forgetting simple tasks. (*Id.* at 430)

Dr. Grossinger referred plaintiff to pain management specialist Phillip Kim, M.D. (*Id.* at 430-31) Dr. Kim diagnosed plaintiff with complex regional pain syndrome on September 12, 2002. (*Id.* at 306-07) On October 16, 2002, Dr. Kim implanted a spinal cord stimulator to manage plaintiff's pain. (*Id.* at 249, 301) Plaintiff indicated that the nerve stimulator helped to relieve her pain at a follow-up visit on October 24, 2002. (*Id.* at 300)

Plaintiff visited Dr. Parkerson for a follow-up on October 30, 2002, complaining of throbbing pain throughout her right upper extremity. (*Id.* at 279, 281) Dr. Parkerson concluded that plaintiff did not have the classic signs of RSD because she did not respond to stellate ganglion blocks, no atrophy was present in the right upper extremity, she had an abnormal pain response which did not fit any one nerve distribution and her pain distribution was not dermatomal. (*Id.* at 282)

On December 16, 2002, plaintiff underwent an independent medical examination by Dr. Stephen Rodgers. (*Id.* at 260-64) During the exam, plaintiff reported having difficulty using her right arm for tasks such as opening a safety pin, buttoning buttons, opening jars and holding a gallon of milk. (*Id.* at 263) Plaintiff reported that she could not identify the denominations of coins or use the right hand in an assistive way, and she used her left hand to maintain her personal hygiene and type on a keyboard. (*Id.*)

6

Dr. Rodgers observed that plaintiff's ranges of motion were mildly to moderately decreased and were limited by pain in the shoulder, elbow and hand. (*Id.*) Plaintiff's right hand grip strength was limited to eight kilograms, and Dr. Rodgers noted subtle swelling in the hand and reduced muscle tone on the right compared with the left. (*Id.*) Dr. Rodgers concluded that plaintiff suffers from forty percent permanent impairment to the right upper extremity. (*Id.* at 264)

On January 23, 2003, plaintiff informed Dr. Kim that she obtained twenty percent pain relief from the stimulator and is able to perform more tasks due to the reduction in pain. (*Id.* at 295) At follow-up visits on February 14 and April 16, 2003, Dr. Grossinger concluded that plaintiff continued to experience reduced sensation in the lateral aspect of the right forearm and most of the right hand despite her use of the stimulator. (*Id.* at 411) Plaintiff's grip strength was reduced on the right, and while there was some improvement with the stimulator, plaintiff experienced difficulties including a urinary tract infection and discomfort along the course of the stimulator and wires. (*Id.* at 413)

Dr. Parkerson examined plaintiff on April 23, 2003. (*Id.* at 268-71) During the examination, Dr. Parkerson again observed that plaintiff did not exhibit any atrophy or symptoms of classic RSD, and she had no edema or discoloration of the right upper extremity. (*Id.* at 271) Plaintiff had normal nerve conduction studies, but exhibited a loss of sensation over the flexor forearm and medial upper arm. (*Id.*) Dr. Parkerson concluded that plaintiff had reached maximum medical improvement and was capable of working in a capacity that would not require the use of her right upper extremity. (*Id.*)

At a May 2, 2003 visit with Dr. Phillip Kim, plaintiff reported that she was

receiving greater than fifty percent pain relief from the stimulator and was able to function. (*Id.* at 291) On June 18, 2003, Dr. Kim revised plaintiff's stimulator because she had lost weight, causing the battery to flip. (*Id.* at 287-89) Dr. Kim also recommended psychological counseling. (*Id.* at 287) On October 2, 2003, plaintiff confirmed that she experienced significant relief from the stimulator following the revision. (*Id.* at 284)

On January 14, 2004, plaintiff reported ongoing pain to Dr. Grossinger, with an approximate twenty percent reduction in pain with use of the nerve stimulator. (*Id.* at 389) Dr. Grossinger noted that plaintiff had an escalating requirement for narcotic medication and that she was depressed. (*Id.*) Dr. Grossinger advised plaintiff to visit a psychiatrist and concluded that her prognosis for recovery was poor. (*Id.* at 390)

On August 16, 2004, Dr. Robert Schwartzman examined plaintiff to assess her candidacy for intravenous Ketamine. (*Id.* at 317-18) During the examination, Dr. Schwartzman observed that plaintiff had difficulty holding her arm above the horizontal on the right, and she performed fine movements poorly in the right upper extremity but was able to walk on heels and toes and get up from a squat. (*Id.* at 318) Plaintiff experienced weakness in her hand muscles, but she had no fasciculations or atrophy in any muscle group. (*Id.*) Plaintiff was unable to inhibit pinprick status and experienced joint pain, which she measured at a 5 to 6 out of 10. (*Id.*) Dr. Schwartzman diagnosed plaintiff with severe brachial plexus traction injury on the right and chronic regional pain syndrome, and he prescribed two days of intravenous Ketamine. (*Id.*)

Plaintiff returned to Dr. Grossinger on September 13 and November 17, 2004.

8

(*Id.* at 400-03) Plaintiff reported severe discomfort of her right arm and unsteadiness on her feet. (*Id.* at 403) She was given leg braces, but was unable to wear them due to swelling in her legs. (*Id.*) Plaintiff's cervical range of motion was restricted, and she experienced decreased sensation throughout her right arm, hyperemic changes in the right forearm and hand, and non-pitting edema in her lower extremities. (*Id.*) Dr. Grossinger noted cool temperature of the forearm and hand on the right with decreased grip strength. (*Id.* at 400) Dr. Grossinger provided therapeutic injections in the right elbow and knee and encouraged plaintiff to participate in Dr. Schwartzman's Ketamine treatment. (*Id.* at 400-01) At plaintiff's December 1, 2004 follow-up visit with Dr. Grossinger, plaintiff reported that the therapeutic injections given at her previous visit had provided significant relief. (*Id.* at 393)

On December 1, 2004, Dr. Patrick Ward examined plaintiff for an initial worker's compensation evaluation. (*Id.* at 397-99) During the exam, plaintiff reported constant pain from 76 to 100 percent of her waking hours, with pain measured at a 10 out of 10. (*Id.*) Plaintiff's right elbow flexion was normal, and Dr. Ward planned aquatic exercises, ultrasound, electric muscle stimulation and acupuncture. (*Id.* at 398) Dr. Ward diagnosed plaintiff with muscle spasms and lateral epicondylitis, indicating that her condition was not permanent. (*Id.*)

Plaintiff visited Dr. Grossinger on January 26, 2005 for a follow-up visit regarding her elbow pain. (*Id.* at 388) Dr. Grossinger observed that plaintiff continued to experience intense pain in the right arm, right knee, neck and back, although there was some decreased intensity of pain at the side of the prior elbow and knee injections.

(*Id.*) Dr. Grossinger prescribed Cymbalta to reduce plaintiff's neuropathic pain. (*Id.*)
Plaintiff remained on a waiting list to receive intravenous infusions of Ketamine from Dr.
Schwartzman. (*Id.*) At plaintiff's March 30, 2005 visit with Dr. Grossinger, plaintiff
described worsened foot pain and claimed she had experienced a spasm in her right
knee, after which her leg went limp. (*Id.* at 383) Dr. Grossman noted that, despite
some improvement with continued physical therapy, plaintiff's activity level was severely
limited due to her injury. (*Id.*)

On March 21, 2005, Dr. M.H. Borek, a state agency medical consultant,
assessed plaintiff's condition and determined that plaintiff could occasionally lift or carry
twenty pounds and could lift ten pounds frequently, she could stand or walk for about
six hours and sit for about six hours in an eight hour workday, and she was limited to
approximately five minutes of use of her right upper extremity. (*Id.* at 372) Dr. Borek
concluded that plaintiff could not climb a ladder, rope or scaffolding but could frequently
climb ramps or stairs, balance, stoop, kneel and crouch, and she could occasionally
crawl. (*Id.* at 373) Dr. Borek determined that plaintiff was limited in her ability to reach,
handle, finger and feel due to her limited ability to use her right upper extremity. (*Id.* at
374) Dr. Borek established no visual or communicative limitations, but indicated that
plaintiff must avoid concentrated exposure to extreme cold, vibration and machinery or
other hazards. (*Id.* at 375) Dr. Borek concluded that, although plaintiff used a cane to
walk and had some weakness in her right upper extremity, the alleged magnitude of her
symptoms was not supported by the objective medical findings. (*Id.* at 378) According
to Dr. Borek, plaintiff's maximum RFC would be for light work with minimal use of her

right upper extremity.  (*Id.*)

On February 12, 2008, physical medicine and rehabilitation specialist Young Kim evaluated plaintiff's condition on behalf of the Social Security Administration Office of Disability Adjudication and Review.  (*Id.* at 530-35)  Dr. Kim determined that plaintiff could lift and carry up to twenty pounds occasionally but could not lift or carry any amount frequently.  (*Id.* at 530)  Dr. Kim identified plaintiff's condition as RSD involving both upper extremities and both lower extremities with constant pain.  (*Id.*)  Dr. Kim concluded that plaintiff could sit for five hours in an eight hour workday for no more than fifteen minutes at a time, stand for three hours for no more than ten minutes at a time and walk for a total of two hours for no more than ten minutes at a time.  (*Id.* at 531)  According to Dr. Kim, plaintiff did not require the use of a cane and was able to reach, handle, finger, push and pull frequently with both hands, although she could feel only occasionally with her right hand.  (*Id.* at 532)  Dr. Kim determined that dust, odors and fumes could potentially exacerbate plaintiff's asthma, and exposure to vibrations could increase her pain.  (*Id.* at 534)  Dr. Kim observed that plaintiff was able to go shopping, travel independently, walk without a cane, walk a short distance at a reasonable pace on rough surfaces, use public transportation, climb steps with a single hand rail, prepare a simple meal, care for her personal hygiene and sort papers.  (*Id.* at 535)

## C. Hearings Before ALJ

### 1. Plaintiff's testimony

Plaintiff was 36 years old at the time of the hearing before the ALJ on September 11, 2007.  (D.I. 9 at 101)  She had an eleventh grade education and obtained her GED

11

in July 2007. (*Id.* at 102) Plaintiff was not married and lived with her fifteen year-old child. (*Id.* at 101-02) She was five foot three and weighed 208 pounds. (*Id.* at 101) Plaintiff had past work experience as a resident manager for NET Treatment Services, a drug and alcohol treatment center. (*Id.* at 103)

At the hearing, plaintiff testified that she worked as a resident manager until 2001, when she injured her arm and her doctors instructed her to stop working. (*Id.* at 104) She collected worker's compensation benefits following her injury. (*Id.* at 105) In 2006, plaintiff worked as a bus aide for the Red Clay School District, but was fired from her position due to her frequent absences and her inability to sit for extended periods of time and maintain her duties on the bus. (*Id.*) Plaintiff subsequently worked as a substitute teacher at an elementary school, but was unable to work five days a week. (*Id.* at 106)

Plaintiff testified that the pain she experiences all over her body is her most severe impairment, with the most severe pain in her right arm, elbow and shoulder. (*Id.* at 107) According to plaintiff, her right arm does not fully extend and she cannot raise it all the way above her head. (*Id.* at 109) Plaintiff testified that she lacks feeling in her right fingers, experiences tingling and numbness in her right hand constantly, and cannot grasp objects, use a pen to write with, button a blouse or zipper a jacket. (*Id.* at 110-11) Plaintiff testified that she is able to pick up a coin, use a fork, brush her teeth and comb her hair by using her left hand. (*Id.* at 110) Plaintiff uses one finger on her left hand to type on a computer and never types with her right hand. (*Id.* at 111) Plaintiff can open up a car door or doorknob and drive her car with her left hand only.

(*Id.* at 111) According to plaintiff, she can only walk for about ten minutes before taking a break, she can climb stairs but has difficulty going down stairs, and if she stands for more than ten minutes, her knees give out. (*Id.* at 119-20) Plaintiff can sit for about ten or fifteen minutes at a time before she needs to move and can lift five pounds with her left arm, but she cannot lift anything with her right arm. (*Id.* at 120-21)

Plaintiff testified that she previously saw Dr. Kahlon and Dr. Grossinger for her arm pain, and Dr. Phillip Kim performed surgery to place a stimulator in plaintiff's back. (*Id.* at 108) At the time of the hearing, plaintiff only visited her primary care physician, Dr. Yezdani, because her Medicaid did not cover the other doctors. (*Id.* at 108) Plaintiff testified that she takes Percocet for the pain. (*Id.*) Plaintiff testified that she used to receive physical therapy for a period, but stopped because it caused more pain and swelling in her arm. (*Id.* at 112) According to plaintiff, her symptoms have gotten progressively worse, and neither the nerve stimulator nor the pain medication has been effective in reducing the pain. (*Id.*) Plaintiff testified that her average pain level is a nine, with or without medication. (*Id.*)

In addition to her right arm pain, plaintiff suffers from scoliosis, thyroid disease and diabetes. (*Id.* at 113) Plaintiff has not had surgery on her back and does not take special medication to treat her scoliosis, but she received injections and saw a chiropractor for about eight months. (*Id.*) Plaintiff testified that her doctors have concluded that there are no other treatments currently available for her condition, and none of the attempted treatments successfully reduced her pain. (*Id.* at 113-16)

Plaintiff testified that she is easily confused and suffers from a loss of

13

concentration and poor short-term memory as a result of the severe pain she experiences. (*Id.* at 116)  Plaintiff testified that she writes things down and uses a timer to remind her to take her medication and go to her medical appointments. (*Id.* at 116-17)  Plaintiff has not been treated for any mental disorders and has not had a seizure in eight years, and she no longer takes medication for her seizures. (*Id.* at 117)

Plaintiff treats her diabetes by controlling her diet, and she takes thyroid medication to treat her thyroid disease. (*Id.* at 117-18)  Both her thyroid disease and her diabetes are controlled. (*Id.* at 118)  Plaintiff testified that she also suffers from digestive problems and is unable to hold down food. (*Id.*)  Plaintiff saw a gastroenterologist, who concluded that her stomach is normal and her problems are derived from her RSD. (*Id.*)  Plaintiff takes Promethazine for her nausea but finds that it only works sometimes. (*Id.*)  Plaintiff's doctors are hopeful that Medicaid will pay for her to undergo gastric bypass surgery, as she has gained weight since her digestive issues began. (*Id.* at 118-19)

Plaintiff testified that she was diagnosed with asthma, which she treats with an asthma inhaler two or three times a day and a nebulizer about four times a month. (*Id.* at 121-22)  Plaintiff has gone to the emergency room on numerous occasions for her asthma, with symptoms that include shortness of breath, tightening in her chest and coughing. (*Id.* at 122)  Plaintiff also suffers from insomnia and usually only sleeps one to two hours per night. (*Id.*)  Plaintiff has taken Ambien, Ambien CR and over-the-counter medications to treat her sleeping problems, but none of them have proven to be effective. (*Id.* at 123)

14

Plaintiff is able to perform daily activities such as showering, brushing her teeth, combing her hair and getting dressed by herself, but her mother stays with her to help her with daily tasks a couple of times per week. (*Id.*) Plaintiff testified that her son does most of the cooking and cleaning, although plaintiff can make a sandwich for herself, use the microwave and wipe the counters with Clorox wipes. (*Id.* at 123-24) Plaintiff can drive for simple errands but generally does not drive alone and often asks her boyfriend or a friend to drive her places. (*Id.* at 124) Plaintiff's social activities include occasionally going to restaurants and her best friend's house. (*Id.* at 125) Plaintiff testified that her condition prevents her from painting and going to church as she used to. (*Id.*)

During the school year, plaintiff testified that she begins each day by waking her son up for breakfast and taking a walk each morning. (*Id.* at 125-26) Plaintiff straightens up the house, rests for a while, and goes to doctors' appointments about four times per week. (*Id.* at 126) In the afternoon, plaintiff supervises her son while he does his homework and helps him cook. (*Id.* at 126)

When plaintiff worked as a bus monitor, plaintiff's duties entailed sitting at the back of the bus and escorting the students to their seats as they boarded. (*Id.* at 127) Plaintiff would make sure that students who required harnesses were strapped in properly. (*Id.*) Plaintiff reported that it was too difficult for her to lock in the wheelchairs of special needs children, so she was switched to a regular student bus, but she had difficulty getting up and down the aisle. (*Id.* at 127-28) Plaintiff was unable to break up fights, and she claimed that the reports she wrote on student behavior were illegible.

(*Id.* at 128)

## 2. Vocational expert's testimony

Following plaintiff's testimony at the hearing on September 11, 2007, the ALJ

posed several hypothetical questions to the vocational expert ("VE"). Specifically, the

ALJ asked the VE to consider:

> a hypothetical person who's about the claimant's stated age at onset, and
> that is 30 years of age. This person has, well gee, this is a little confusing.
> At the time the person had 11th grade education. She currently has a
> GED, so I guess perhaps what we should do is just say that because of
> the time we're concerned about she had not passed the GED. So we're
> going to say she has an 11th grade education. That work history that
> you've just talked about. Now, if we were to start in with the assessment
> from the DDS. This is a person who is limited to working at a light level of
> exertion. However, when I say working at a level of exertion, basically the
> right extremity is dominant. This person would be working at a sedentary
> level of exertion with the dominant extremity at the light level of exertion
> with the non-dominant left extremity. Now in your opinion, Mr. Melanson,
> just based on that, is that essentially a sedentary RFC or a light RFC?
> How would you characterize it?

(*Id.* at 135) At this juncture, the ALJ elicited from the VE that the RFC would be

sedentary because a full range of light RFC would not be possible. (*Id.* at 135-36) The

ALJ continued:

> Now, so we're talking about sedentary, standing and walking basically six
> hours in an eight-hour workday, sitting basically six hours in an eight-hour
> workday. So, we're going to characterize this however, as a sedentary
> RFC. There is to be no climbing of ladders, ropes, or scaffolds, only
> occasional crawling. Essentially the using of the right extremity for
> handling, reaching, fingering, feeling would be occasional rather than
> frequent, unlimited with the left extremity. Environmentally avoid
> concentrated exposure to fumes, odors, dusts, gases, poor ventilation,
> extremes in cold and to hazards . . . Would there be any, oh, and simple
> unskilled work due to medications, side effects, and the issues of pain.
> Would there be any simple unskilled work such a person could do at a
> sedentary level of exertion in your opinion?

(*Id.* at 136) Based on this hypothetical, the VE testified that plaintiff could perform at

least three sedentary, unskilled positions: security monitor with 1,400 positions locally

and 140,000 positions nationally; information clerk with 600 positions locally and 85,000

nationally; and machine tender with 300 positions locally and 70,000 nationally. (*Id.* at

136-37) The VE acknowledged that plaintiff could not perform any work in the economy

if Dr. Yezdani's RFC analysis were accepted as true. (*Id.* at 138)

The ALJ took additional testimony from another VE at the hearing on remand on

November 5, 2008. (*Id.* at 74-92) Specifically, the ALJ asked the VE to consider

a hypothetical person who is, on the date of onset, which is now '04,
would be 34 years of age, has a 12th-grade GED education. There are
certain underlying impairments that place limitations on the ability to do
work-related activities. Now, in the, in this hypothetical . . . we're going to
assume, that this is a person who is right-hand dominant. The issue is an
injury with resulting problems to the right upper extremity. The claimant
also indicated that she had back problems and diabetes and so we're
going to assume that this person would be limited to standing and walking
about six hours in an eight-hour workday and sitting about six hours in an
eight-hour workday. Now, in his narrative, Dr. Kim indicated that . . . lifting
would be limited to 10 to 20 pounds due to pain in both extremities. So, if
we start there and we say that this person is limited to light level work; this
person would have posturals, would have limited pushing and pulling with
the upper extremities; only occasional crawl, this is posturally; and no
climbing of ladder, rope or scaffold; handling and fingering and reaching,
and I should say pushing and pulling upper extremities are frequent rather
than constant; reaching overhead; handling, fingering, feeling are frequent
with the right, with the left hand. The right hand is the same, except that
feeling with the right hand would be occasional rather than frequent. And
all of the posturals, instead of only crawling being occasional we'll make
them all occasional, but no climbing of ladder, rope or scaffold. With that
hypothetical, in your opinion, would such a person be able to do the
claimant's past relevant work?

(*Id.* at 81-83) Based on this hypothetical, the VE testified that plaintiff could perform her

past relevant work. (*Id.* at 83) The ALJ included additional environmental limitations,

17

such as avoiding concentrated exposure to hazards, temperature extremes, odors, dusts, gas, poor ventilation, humidity and wetness. (*Id.*) The VE testified that these additional limitations would have no bearing on plaintiff's ability to perform her past relevant work. (*Id.*)

The VE testified that plaintiff could also perform at least three sedentary, unskilled positions:  order clerk with 500 positions locally and 40,000 nationally; security monitor with 400 positions locally and 22,000 nationally; and charge account clerk with 500 positions locally and 39,000 nationally. (*Id.* at 83-84)  The VE further testified that plaintiff could perform at least three light, unskilled positions:  gate tender with 400 positions locally and 27,000 nationally; copier operator with 250 positions locally and 9,000 nationally; and interviewer with 800 positions locally and 59,000 nationally. (*Id.* at 84)  The VE acknowledged that, if the hypothetical involves an individual who can occasionally lift ten pounds and occasionally lift twenty pounds, the light exertional positions would be eliminated because they require the frequent lifting of ten pounds. (*Id.* at 86)  According to the VE, the sedentary positions could be done single-handedly or bilaterally. (*Id.*)

The VE noted that adding a limitation to the hypothetical in which plaintiff could only sit and stand in combination for up to five hours a day would eliminate all three sedentary positions. (*Id.* at 87)  The ALJ again changed the hypothetical to add a limitation of five hours of sitting and three hours of standing in an eight-hour day. (*Id.* at 88)  In response, the VE testified that none of the positions would be eliminated. (*Id.* at 89)

## III. STANDARD OF REVIEW

Findings of fact made by the Commissioner are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the Commissioner's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the Commissioner's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotations omitted). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of

Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g., that offered by treating physicians)–or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the Commissioner "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for

rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Eligibility for DIB under the Social Security Act is conditioned on compliance with all relevant requirements of the statute. *See* 42 U.S.C. § 423(a). The Social Security Administration is authorized to pay DIB to persons who are "disabled." 42 U.S.C. § 423(a)(1)(E). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003). To determine disability, the Commissioner uses a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i) (mandating a finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (requiring finding of not disabled when claimant's impairments are not severe). If

claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (the "listing") that are presumed severe enough to preclude any gainful work.[4] *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(d).[5]

At step four, the Commissioner determines whether the claimant retains the RFC to perform her past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (stating a claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428. If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating that a claimant is not disabled if the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work

---

[4] Additionally, at steps two and three, claimant's impairments must meet the duration requirement of twelve months. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii-iii).

[5] Prior to step four, the Commissioner must assess the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. § 404.1520(a)(4). A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment[s]." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (quoting *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000)).

before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity." *Id.* This determination requires the Commissioner to consider the cumulative effect of the claimant's impairments and a vocational expert is often consulted. *Id.*

## B. Whether the ALJ's Decision is Supported by Substantial Evidence

In the present case, the court recognizes that the first four steps of the five-part test to determine whether a person is disabled are not at issue: (1) the ALJ determined that plaintiff has not engaged in substantial gainful activity since the alleged onset of her disability in August 2004; (2) the ALJ qualified plaintiff's impairments as "severe" impairments; (3) the ALJ determined that plaintiff's impairments do not meet or medically equal one of the medical impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, that would preclude any gainful work; and (4) the ALJ determined that plaintiff is unable to perform any past relevant work. Plaintiff contests the ALJ's finding regarding step five in the regulatory process.

In support of her motion for summary judgment, plaintiff contends that the ALJ improperly substituted her own lay judgment for the opinions of plaintiff's treating physicians and other medical experts. (D.I. 13) According to plaintiff, the ALJ erred by not giving controlling weight to the opinions of her treating physicians, who concluded that plaintiff is disabled as a result of the pain associated with her RSD. (*Id.* at 9-20) In response, defendant contends that the ALJ correctly weighed the medical evidence of

record when assessing plaintiff's condition and reasonably concluded that plaintiff's subjective complaints of pain and functional limitation were not entirely credible. (D.I. 34 at 3-12)

It is well established that "the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence." *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988); *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) ("A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.") (internal quotations omitted). The Third Circuit has stated that an ALJ cannot disregard the opinion of a treating physician without referencing objective medical evidence conflicting with the treating physician's opinion and explaining the reasoning for rejecting the opinion of the treating physician. *See Gilliland v. Heckler*, 786 F.2d 178, 184 (3d Cir. 1986). However, the ALJ is not required to give controlling weight to the statements of a plaintiff's treating physicians regarding the plaintiff's disability or fitness for returning to work. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e); *Adorno v. Shalala*, 40 F.3d 43, 47-48 (3d Cir. 1994).

Because non-examining state agency medical consultants are "highly qualified" physicians and "experts in Social Security disability evaluation," their opinions on a claimant's residual functional capacity are entitled to weight. 20 C.F.R. § 404.1527(f); *see Jones v. Sullivan*, 954 F.2d 125, 128 (3d Cir. 1991). Therefore, when there is conflicting evidence, including medical opinions, an ALJ decides whether a claimant is

disabled after carefully evaluating all available evidence. *See* 20 C.F.R. §
404.1527(c)(2).

The court concludes that the ALJ properly weighed the medical evidence of
record when assessing plaintiff's condition. In assigning little weight to the opinions of
plaintiff's treating physicians, the ALJ referenced medical evidence conflicting with the
treating physicians' opinions and explained her reasoning for rejecting those opinions.
First, the ALJ cited the medical record as a whole in support of her decision to assign
little weight to the opinions of plaintiff's treating physicians, noting plaintiff received
significant relief from the stimulator and was able to function with reduced pain levels.
(D.I. 9 at 25)

Next, the ALJ explained her reasons for rejecting the opinions of Drs. Yezdani
and Grossinger.[6] According to the ALJ, Dr. Yezdani's opinion was inconsistent with the
objective medical evidence of record and relied on plaintiff's subjective complaints of
pain. (*Id.* at 29) Dr. Yezdani's specialty in general medicine and lack of training in
occupational health also contributed to the ALJ's decision to assign the opinion little
weight. (*Id.*) The ALJ also correctly noted that Dr. Yezdani's opinion regarding
plaintiff's ability to work is a determination reserved to the Commissioner. *See Adorno
v. Shalala*, 40 F.3d 43, 47-48 (3d Cir. 1994) ("We recognize, of course, that a statement
by a plaintiff's treating physician supporting an assertion that she is 'disabled' or 'unable
to work' is not dispositive of the issue."). In assigning little weight to Dr. Grossinger's

---

[6]Although the ALJ also rejected the opinions of Drs. Hogan and Kahlon, plaintiff
does not challenge the ALJ's findings regarding the lack of value of those opinions
because both treating physicians treated plaintiff well before the alleged onset date.
(D.I. 13 at 14)

opinion that plaintiff was unfit for employment, the ALJ reasoned that Dr. Grossinger did not specialize in vocational rehabilitation, plaintiff disproved Dr. Grossinger's opinion by subsequently returning to work, and the opinion was an administrative finding reserved to the Commissioner pursuant to 20 C.F.R. §§ 404.1527(e), 416.927(e). (D.I. 9 at 30)

The court further concludes that the ALJ did not err in partially crediting the opinions of Dr. Parkerson, an examining physician, and Dr. Borek, a non-examining state agency physician. The ALJ explained that Dr. Parkerson's opinion regarding plaintiff's ability to work was consistent with the medical evidence of record, including plaintiff's return to work in 2006, and Dr. Parkerson was qualified to make such a determination due to his Board certification in occupational medicine. (Id. at 29) The ALJ rejected Dr. Parkerson's opinion only to the extent that it was inconsistent with the medical record as a whole. (Id.) Specifically, the ALJ noted that no objective medical evidence supported Dr. Parkerson's conclusion that plaintiff had a complete inability to use her right upper extremity. (Id.)

Moreover, the ALJ properly credited Dr. Borek's opinion to the extent that he found plaintiff could sit for six hours in an eight hour day, had a limited ability to push and pull in the upper extremities, could occasionally crawl, could never climb a ladder, rope or scaffold, had a limited ability to reach, handle, finger and feel and should avoid concentrated exposure to cold and hazards, because these limitations were consistent with the medical record as a whole. (Id.) The court finds no error in the ALJ's rejection of Dr. Borek's opinion to the extent that it imposed a limitation on plaintiff's exposure to vibration because the objective medical evidence of record does not support a conclusion that plaintiff's pain is exacerbated by vibration. (Id.)

## V. CONCLUSION

For the reasons discussed above, the court finds that the ALJ's decision is supported by substantial evidence. Plaintiff's motion for summary judgment (D.I. 12) is denied and defendant's motion for summary judgment (D.I. 33) is granted. An appropriate order shall issue.